412

NEW IDRIA QUICKSILVER MINING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

KLAU MINE, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

OAT HILL MINE, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILD HORSE QUICKSILVER MINING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 112386–112389. Promulgated July 14, 1943.

*Robert M. Searls, Esq.,* for the petitioners.
*Harry R. Horrow, Esq.,* for the respondent.

OPINION.

SMITH, *Judge:* Our first question is the determination of the correct basis to be used in computing percentage depletion deductions on petitioners' quicksilver mines. Petitioners contend that the correct basis is the market value of the mercury in flasks, as reflected in the gross sales of mercury in each of the taxable years. The respondent contends that it is the market value of the cinnabar ore, from which the mercury was obtained, at the mouth of the mines, arrived at by deducting from gross sales of mercury the cost of processing the ore, including furnacing, condensing, cleaning, flasking and transporting.

Section 23 (m) of the Internal Revenue Code provides for a reasonable allowance for depletion, in the case of mines, to be made under rules and regulations to be prescribed by the Commissioner, and section 114 (b) (4) allows percentage depletion in the case of metal

mines in the amount of 15 percent of the gross income from the property. The Commissioner, in Regulations 103, section 19.23(m)–1(f), states that gross income from the property means the selling price of the crude mineral product in the immediate vicinity of the mine, but that if the product is processed, or if there is no representative market, the market value of the crude mineral product is constructed by deducting costs from the first marketable product, except that the costs of certain processes are not deductible. The exception applicable to quicksilver is the cost of "crushing, concentrating (by gravity or flotation), and other processes to the extent to which they do not beneficiate the product in greater degree (in relation to the crude mineral product on the one hand and the refined product on the other) than crushing and concentrating (by gravity or flotation)." Applying his regulations, the respondent has computed petitioners' depletion deductions on gross sales of mercury less that portion of the cost of production and a representative portion of the profits attributable to furnacing, condensing, cleaning, flasking, and transporting the mercury.

The undisputed facts are that petitioners did not sell the crude mineral product (that is the cinnabar ore) in the vicinity of the mine, or elsewhere, and that there was no representative market value for such product. It was therefore necessary for the respondent in applying his regulations to construct a market value for the product, as he did. Our question then is, did the furnacing, condensing, cleaning, and flasking "beneficiate" the product to a greater degree than crushing and concentrating by gravity or flotation, so that the cost of those processes must be deducted from the gross sales in determining the market value of the product.

In mining parlance the term "beneficiate" means:

a. To reduce (ores).

b. To concentrate or otherwise prepare for smelting (esp. iron ore), as by drying, sintering, magnetic concentration, etc. (Webster's New International Dictionary, 2d Ed.)

In the process of concentrating ores by the gravity method the crushed ore is placed on tables and agitated so that the higher and lower specific gravity elements are mechanically separated. In the flotation method the crushed ore is mixed with oils in vats and agitated by means of steam or mechanical devices. The metallic particles rise as a froth on the oil and are then collected. The concentrating processes are usually followed by smelting. The evidence before us is that the cinnabar ore was not concentrated, either by the gravity or the flotation method, and that there was no process comparable thereto. The ore was fed into the furnaces as it emerged from the mine.

The evidence is that, preliminary to furnacing, the cinnabar ore was crushed at the mines to a size of not more than two inches. A much finer crushing is required in the process of concentrating ores, especially by the flotation method where the ore is reduced to a powder form. If used in that sense in the regulations, as apparently it is, petitioners neither crushed nor concentrated the cinnabar ore before furnacing.

According to the testimony of the witnesses in these proceedings, it is physically possible to concentrate cinnabar ore either by gravity or flotation, but this was not done by petitioners or by the quicksilver mining industry anywhere in the United States at any time during the taxable years, for the reason that it had been proved uneconomical. After concentrating the ore the other processes of furnacing, condensing, cleaning, and flasking were still necessary. From these facts it is reasonable to conclude, we think, that all of these processes, that is, furnacing, condensing, cleaning, and flasking, beneficiated the product in a greater degree than "crushing" and "concentrating" and therefore do not come within the excepted processes referred to in subsection (f) (4) of the regulations.

Perhaps, as petitioners argue, the regulations were not drafted to fit the particular conditions of quicksilver mining. Nevertheless the purpose of the regulations is clear. It is to compute the percentage depletion allowances for all types of mines on the basis of income attributable to the using up or the "depletion" of the mineral or metal products, as distinguished from the income attributable to the various processes utilized in preparing the product for the market. We can not say that in their plan for furtherance of that purpose the regulations are so contrary to the statute or so out of harmony with the meaning and purpose of the statute as to be invalid. See *Commissioner* v. *Winslow*, 113 Fed. (2d) 418, and cases there cited.

Literally, the statute provides that the depletion allowance shall be computed on a percentage of the "gross income from the property." Gross income is defined in section 22 of the Internal Revenue Code as:

* * * gains, profits, and income derived from * * * trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from * * * the transaction of any business carried on for gain or profit, * * *

Section 19.22 (a)–5 of Regulations 103, promulgated under the quoted provision of the Code, defines gross income as follows:

SEC. 19.22 (a)–5. *Gross income from business.*—In the case of a manufacturing, merchandising, or mining business, "gross income" means the total sales, less the cost of goods sold, plus any income from investments and from incidental or outside operations or sources. In determining the gross income subtractions should not be made for depreciation, depletion, selling expenses, or losses, or for items not ordinarily used in computing the cost of goods sold.

See also *Eisner* v. *Macomber*, 252 U. S. 189; *Merchants' Loan & Trust Co.* v. *Smietanka*, 255 U. S. 509; *Crews* v. *Commissioner*, 89 Fed. (2d) 412.

In the case of oil and gas wells gross income from the property, for the purpose of computing depletion deductions, has been defined as that portion of the total profits from the sale of oil and gas which represents the fair market or field price at the mouth of the wells. *Greensboro Gas Co.* v. *Commissioner*, 79 Fed. (2d) 701, affirming 30 B. T. A. 1362; certiorari denied, 296 U. S. 639; *Consumers Natural Gas Co.* v. *Commissioner*, 78 Fed. (2d) 161. See also *Helvering* v. *Twin Bell Oil Syndicate*, 293 U. S. 312; *Helvering* v. *Mountain Producers Corporation*, 303 U. S. 376. In *Anderson* v. *Helvering*, 310 U. S. 404, it was said that:

Oil and gas reserves like other minerals in place, are recognized as wasting assets. The production of oil and gas, like the mining of ore, is treated as an income-producing operation, not as a conversion of capital investment as upon a sale, and is said to resemble a manufacturing business carried on by the use of the soil. * * * (Citing cases). The depletion effected by production is likened to the depreciation of machinery or the using up of raw materials in manufacturing. * * * (Citing cases). The deduction is therefore permitted as an act of grace and is intended as compensation for the capital assets consumed in the production of income through the severance of the minerals. * * * The granting of an arbitrary deduction, in the interests of convenience, of a percentage of the gross income derived from the severance of oil and gas, merely emphasizes the underlying theory of the allowance as a tax-free return of the capital consumed in the production of gross income through severance. * * *

In *Brea Cannon Oil Co.* v. *Commissioner*, 77 Fed. (2d) 67; certiorari denied, 296 U. S. 604, the Court held, affirming 29 B. T. A. 1134, that 60 percent of the gross receipts from the sale of casinghead gas represented the cost of processing, by which the casinghead gas was separated from the wet gas with which it was mixed as it emerged from the well, and did not constitute "gross income of the property" for the purpose of determining percentage depletion deductions. The Court said in that case:

While the act of Congress and regulations adopted in pursuance thereof must be construed according to their plain import, it should be borne in mind in determining the amount of the depletion allowance that such allowance is intended to represent the amount of capital recovered in the product produced by the well, that is the value of the raw product. * * *

We think that the result which the respondent has reached here by applying his regulations comports with the purpose of section 114 (b) (4) of the Internal Revenue Code as that section has been construed by the courts. The position taken by the petitioners, that their percentage depletion on quicksilver mines should be computed upon the total gross sales of mercury as finally processed, is, we think, contrary to the purpose of the statute.

The second issue involves the question of the right of the petitioner, New Idria Quicksilver Mining Co., to include in the basis for computing depletion deductions in each of the taxable years the income derived from the sale of mercury extracted from the dump ores which it processed during each of such years.

This question is controlled, we think, by the opinion of the Circuit Court of Appeals for the Tenth Circuit in *Atlas Milling Co.* v. *Jones*, 115 Fed. (2d) 61, and the opinions of this Court in *Carl M. Britt*, 43 B. T. A. 254, and *Consolidated Chollar Gould & Savage Mining Co.*, 46 B. T. A. 241. Depletion deductions on dump ores or "tailings" claimed by the taxpayers in those cases were disallowed on the grounds that such deposits are not "mines" and that they do not represent a depletable interest in the hands of the owner. Although the facts in the instant case differ somewhat from those in the cited cases, we think that the same principle governs. In the *Atlas Milling Co.* case, *supra*, and in the *Carl M. Britt* case, *supra*, the taxpayers were lessees who had acquired, by contract, the right to process the dump ores which had been deposited on the premises of the lessors. In *Consolidated Chollar Gould & Savage Mining Co.*, *supra*, the dump ores had been deposited on the taxpayer's land by others prior to its acquisition by the taxpayer. The only difference between the facts in that case and those in the instant case is that here the dump ores originally came from the mine located on the taxpayer's property rather than from the properties of others. In this respect the facts in this case resemble those in *Kennedy Mining & Milling Co.*, 43 B. T. A. 617, where we held, distinguishing the *Atlas* and the *Britt* cases, *supra*, that the taxpayer was entitled to include in its basis for computing percentage depletion deductions the income from processing dump ores which it had taken from its own mine during its ownership and operation of the mine. We said that:

* * * The economic interest of this petitioner in the tailings and in the minerals to be extracted therefrom was identical with the interest it had maintained through its ownership of the mine from beginning to end of the extractive process; and when it finally received the proceeds of the minerals contained in the tailings it received income from the contents of the mine to exactly the same extent as the income it had previously received from the earlier and more rudimentary refining process. It follows that respondent's disallowance of petitioner's claim was error and should be reversed.

That is not the situation here. The income which petitioner received from processed dump ores was not income from the operation of its mine. The dump ores had been removed from the mine long before the petitioner acquired the property and were not a part of the mine at any time during petitioner's ownership. The evidence does not show that any value was attributed to the dump ores as separate property in petitioner's acquisition of the mine or that they had any cost to the petitioner. In these circumstances we think that petitioner's

claim for a percentage depletion allowance based on the income received from processing the dump ores must be denied.

The remaining question for determination involves the payment of $3,750 which Oat Hill Mine, Inc., made during the taxable year 1940 to Pacific Gas & Electric Co. representing the cost of an extension of a power line to its mine. Petitioner claimed the deduction of the entire amount of the payment in its return for 1940 as an ordinary and necessary business expense. It now contends that it is entitled to the deduction either of the full amount as claimed in its return, or in the alternative, to an aliquot portion thereof spread ratably over the anticipated use of the facilities. The respondent contends that no part of the expenditure is deductible in the taxable year 1940. We think that the respondent's position is sound. Where the benefits obtained from an expenditure extend over a period of one year or less the amount is usually deducted in full in the year of payment, other conditions of the statute authorizing the deduction being met. If they extend for a longer period the cost of the facilities may require spreading over the period of their expected use.

The facts here are that the petitioner made the payment in question under a contract which provided that the whole amount, except for the normal consumer's deposit, would be returned to it at the end of a three-year period, provided certain conditions should be met. There was no way of knowing at the time of the payment, or at any time during the taxable year, whether those conditions would be met and whether the amount would ever be refunded.

In any event it seems to us that the expenditure was in the nature of a capital investment, since the benefit to be derived from it was to extend over the entire period of petitioner's operations. In *Duffy* v. *Central Railroad Co. of New Jersey*, 268 U. S. 55, the Supreme Court said, of expenditures made by the lessee of railroad properties for additions and betterments under a long term lease, that:

Clearly the expenditures were not "expenses paid within the year in the maintenance and operation of its [respondent's] business and properties;" but were for additions and betterments of a permanent character, such as would, if made by an owner, come within the proviso in subdivision Second, "that no deduction shall be allowed for any amount paid out for new buildings, permanent improvements, or betterments made to increase the value of any property, etc." They were made, not to keep the properties going, but to create additions to them. They constituted, not *upkeep*, but *investment*;—not maintenance or operating expenses, deductible under subdivision First, section 12 (a), but capital, subject to annual allowances for exhaustion or depreciation under subdivision Second.

Under petitioner's contract with the electric company the equipment became the property of the latter. What petitioner actually acquired was a contractual right to have electric current furnished at its mine for an indefinite period. While the contract does not so provide, we

assume that petitioner was to pay the normal rate charged to other consumers and that it was entitled to the services as long as it should operate the mine, without any further outlay of capital. Even if petitioner should be regarded as having a capital investment in the facilities or in the contract itself, we have no means of determining the period of their expected use by the petitioner on which to base any allowance for depreciation or exhaustion. Petitioner argues in its brief that the evidence shows an expected use of not more than three years and refers us to the following testimony of one of its witnesses:

Q. Looking at the situation as it appeared at the time you made this deposit with the Pacific Gas and Electric Company, what would you say was the then apparent life of the operation?
A. As long as the war, which might have been three years, possibly less at that time.

This evidence is much too indefinite and speculative to support an allowance for depreciation or exhaustion of capital assets. The probable duration of the war in 1940, even as today, was a matter on which the best informed persons widely disagreed. It is not explained either why petitioner's operations were expected to continue only for the duration of the war. We do not have petitioner's lease before us and do not know the length of its term. So far as the evidence shows, the mine is still being operated, although it is stipulated that petitioner was dissolved as a corporate entity under the laws of the State of California in December 1941. The respondent has determined no deficiency against Oat Hill Mine, Inc., for 1941.

On the evidence available, we think that petitioner has failed to establish its claim for a deduction of all or any portion of the expenditure in question in the taxable year 1940.

*Decisions will be entered under Rule 50.*