CHICAGO MINES COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

THE LONDON EXTENSION MINING COMPANY, TRANSFEREE OF CHICAGO MINES COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

THE LONDON EXTENSION MINING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 5469, 5470, 5471. Promulgated November 7, 1946.

*Frazer Arnold, Esq.,* and *Charles Kentor, Esq.,* for the petitioners.
*Gene W. Reardon, Esq.,* for the respondent.

OPINION.

DISNEY, *Judge*: The above named cases, duly consolidated, involve income and excess profits taxes, as follows:

| Petitioner | Docket No. | Year | Tax | Deficiency asserted | Refund claimed |
|---|---|---|---|---|---|
| Chicago Mines Co. | 5469 | 6/1/40 to 5/31/41 | Income | $3,153.84 | |
| | | 6/1/40 to 10/8/40 | Excess profits | 1,816.52 | $2,147.29 |
| London Extension Mining Co. | 5471 | Calendar year 1940. | Income | 1,914.86 | |
| | | Calendar year 1941. | Income | 1,119.60 | |

Docket No. 5470 involves transferee liability of the London Extension Mining Co. as transferee of Chicago Mines Co. The questions presented are whether the two petitioners are entitled to percentage depletion, and, if so, the amounts thereof.

All facts were stipulated. We adopt by reference the two stipulations filed, and find the facts therein set forth, but as there is some duplication, we set forth such facts as follows:

1. Chicago Mines Co., petitioner in Docket No. 5469 and sometimes hereinafter referred to as Chicago Co., was a corporation organized in 1937 under the laws of the State of Colorado. Petitioner London Extension Mining Co. is a corporation organized in 1925 under the laws of the State of Colorado. Chicago Co. was a wholly owned subsidiary of the London Extension Mining Co., petitioner in Docket No. 5470 and Docket No. 5471 and sometimes hereinafter referred to as London Co.

2. Petitioner London Co. owns an undivided one-half interest in the American, Fraction, Huron, and Ibex lode mining claims in Park County, Colorado. The remaining one-half interest in the American claim is owned by a group of individuals sometimes called the Ellis heirs. The remaining undivided one-half interests in the Fraction, Huron, and Ibex claims are owned by the London Mines & Milling Co., a corporation having no interrelationship with petitioner. Petitioner London Co. acquired its undivided one-half interest in the American claim on October 11, 1929, and its undivided one-half interests in the Huron, Fraction, and Ibex claims in 1926 and 1927. These claims collectively are known as the American Mine.

3. Amer Mining Co., a Colorado corporation, obtained a lease from the Ellis heirs, petitioner London Co., and the London Mines & Milling Co. to prospect and mine certain blocks of the American, Fraction, and Ibex claims and to extract ore therefrom. Said lease was successively assigned to W. A. Ellis, Inc., and thence to the petitioner London Co. on or about June 7, 1940. During the period 1930 to May 1940 the Amer Mining Co., in connection with its operation of the American Mine under said lease, shipped the high grade ore and placed the resulting waste material and low grade ore upon the surface of the ground, thus creating the American dump. The greater portion of this dump was placed upon the surface of the Fraction claim, smaller portions being on the surface of the American and Huron claims, all these claims being contiguous.

4. Petitioner Chicago Co. entered into a lease from London Co. on June 10, 1940, under which Chicago Co. immediately thereafter proceeded to mill that part of the American dump which could be sorted and milled at a profit, until October 8, 1940, when Chicago Co. was dissolved. The lease provided, *inter alia*, tnat the London Co., referred to as a Colorado corporation, owner of the American Waste Dump, leased it to Chicago Co., referred to as a Colorado corporation, in consideration of royalties of 20 per cent of net smelter and mint returns, and that Chicago Co. could use the buildings and equipment on the claim to house and board men and could remove, during or at the end of the lease, any equipment and supplies belonging to it. The party signing as president of Chicago Co. also signed as secretary of London Co., and the vice president of London Co. signed as secretary of Chicago Mines. No other officers signed the lease. From October 8, 1940, to the end of that year, London Co. itself carried on the working and milling of the American dump. From June 7, 1940, London Co. also carried on underground mining operations under its said leases until August 20, 1940, when its lease from the Ellis heirs expired, and for the remainder of 1940 it continued to operate under the Colorado Co-Owner Statute (Colo. Stat. Ann., vol. 3, ch. 92, secs. 8 to 16).

5. Chicago Co., in its income tax return filed for the year June 1, 1940, to May 31, 1941, deducted percentage depletion of $10,150.34, which sum represents 15 per cent of its gross income, after deduction of royalties, from its operation and milling of the American dump. Said $10,150.34 did not exceed 50 per centum of the net income of Chicago Co. from the American dump.

6. The corporate life of Chicago Co. expired October 8, 1942, and all its assets previously were transferred to its parent company, the London Co., and the capital stock held by said parent company and the qualifying shares held by its directors were at that time canceled and surrendered.

7. Petitioner London Extension Mining Co. is liable as a transferee for any deficiency in income tax for the taxable year June 1, 1940, to May 31, 1941, and any deficiency in excess profits tax for the taxable period June 1 to October 8, 1940, that may be determined against petitioner Chicago Mines Co., transferor, together with interest thereon as provided by law. The only issue remaining in Docket Nos. 5469 and 5470 is the question of percentage depletion for the taxable periods herein involved and mentioned in this paragraph.

8. As a result of London Co.'s working of the American dump, it realized during 1940 the sum of $57,014.58 as its net smelter returns after deducting marketing and transportation costs. It also received $16,917.23 as royalty from Chicago Mines Co. under its lease to Chicago Mines Co. on the said dump. It also received the sum of $22,638.45 as its net smelter returns on its underground mining operations of the American Mine. London Co. claimed depletion in its return; and it is agreed that if the Tax Court decides that London Co. is entitled to depletion on the operation of the American dump and that the operations of the dump and the American Mine constitute one mining property, then London Co. would be entitled to $14,485.54 disallowed depletion (i. e., American Mine $3,395.77, American dump $8,552.19, American dump royalties $2,537.58).

9. It is further agreed that the Commissioner did not err in disallowing the claim of Chicago Co. for relief under section 722 of the Internal Revenue Code and that there are no overpayments in excess profits taxes due to either petitioner herein for the excess profits taxable period June 1 to October 8, 1940, of Chicago Co. attributable to any allowance under said section 722.

10. It is further agreed that in Docket No. 5469 the only question involved is the right of Chicago Co. to the deduction of $10,150.34 depletion.

We first consider the question whether Chicago Co. is entitled to the deduction of $10,150.34 for depletion from its working of the American dump from about June 10, 1940, the date of its lease from its parent, London Co., to October 8, 1940, when Chicago Co. was dissolved. Chicago Co.'s argument is, in brief, that even as nominal lessee from London Co. it is entitled to the deduction under sections 23 (m) and 114 (b) (1), (4) (A) and (B) of the Internal Revenue Code;[1] also that Chicago Co., though nominally a lessee from London

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \* \* \* In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. \* \* \*

Co., was in essence and effect only an alias or operating department of that company, its sole owner, and both were operated by the same corporate officers; therefore, London Co. being the owner of the ore, Chicago Co. had an economic interest as *alter ego* of London Co.; also that an equitable apportionment of the deduction for depletion between lessor and lessee was for the lessor to deduct 15 per cent of the royalty paid, and the lessee to deduct 15 per cent of the balance of the mill or smelter returns—not exceeding 50 per cent of net income. The respondent's position is that Chicago Co. was a mere contractor, not the owner or creator of American dump, and that the dump was not a mine or natural mineral deposit; hence, that Chicago Co. is not entitled to deduct depletion.

After study of the facts, the interesting question involved, and authorities cited, we come to the conclusion that the Chicago Co.'s position is not well taken. We are able to discern no economic interest in Chicago Co. as lessee. Its parent, London Co., was the owner, and let a contract to it for the milling of ore in the dump. The dump was not a "mine," within the text of section 23 (m), to a lessee extracting ore therefrom, and Chicago Co. was not, as lessee, entitled to depletion therefrom. *Atlas Milling Co.* v. *Jones*, 115 Fed. (2d) 61, properly points out that depletion allowance is a matter of grace and one claiming it must bring himself within a statute allowing it. To the same effect are *Consolidated Chollar Gould & Savage Mining Co.*,

---

SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

&ast; &ast; &ast; &ast; &ast; &ast;

(b) BASIS FOR DEPLETION.—

(1) GENERAL RULE.—The basis upon which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 113 (b) for the purpose of determining the gain upon the sale or other disposition of such property, except as provided in paragraphs (2), (3), and (4) of this subsection.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(4) PERCENTAGE DEPLETION FOR &ast; &ast; &ast; METAL MINES &ast; &ast; &ast;.—

(A) In General.—The allowance for depletion under section 23 (m) shall be, in the case of &ast; &ast; &ast; metal mines, &ast; &ast; &ast; 15 per centum, &ast; &ast; &ast; of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23 (m) be less than it would be if computed without reference to this paragraph.

(B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining," as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term "ordinary treatment processes," as used herein, shall include the following: &ast; &ast; &ast; (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores. &ast; &ast; &ast;

46 B. T. A. 241, and *Carl M. Britt*, 43 B. T. A. 254. Though the petitioner cites and relies on *New Idria Quicksilver Mining Co.* v. *Commissioner*, 144 Fed. (2d) 918, reversing 2 T. C. 412, therein we followed *Atlas Milling Co.* v. *Jones*, *supra*, and are of the opinion it lays down the proper rule for us here. *Kennedy Mining & Milling Co.*, 43 B. T. A. 617; affd., 125 Fed. (2d) 399, also relied on by the petitioner, is, as we pointed out in the *Consolidated Chollar* case, *supra*, distinguishable in that therein the "tailings" worked were severed from mines owned by the claimant for depletion.

This brings us to Chicago Co.'s contention of its oneness with London, its parent. Fully aware of the two recognized lines of cases on that subject, which need not be cited, we consider this one where corporate entity should not be disregarded. To sustain Chicago Co.'s contention in that respect would be to sustain clear inconsistency. London Co., parent, instead of working the dump itself, saw fit, apparently for its own reasons, to make a contract of lease with its subsidiary, thereby recognizing and utilizing the separateness of corporate entity. It was to receive only a royalty or share of the returns from operation, as contrasted with the entire returns appertaining to an owner (which London Co. was called in the lease). The distinction in corporate entities and properties was emphasized by the lease provision referring to each as a Colorado corporation and providing that at the end of the lease Chicago Co. could remove any equipment and supplies belonging to it and might use buildings and equipment on the claim to house and board men necessary to the operation. Separateness of ownership and property rights was clearly intended. The net income from the operations was, by the lease, divided for income tax purposes between the two companies. It would be inconsistent to take the view that, for the purposes of deduction of depletion in computing that income, the companies are nevertheless one. Also, though Chicago Co. urges that it was a mere agency or *alter ego* of its parent, we have nothing in the record before us on the subject save the contract of lease. In some cases evidence as to operation, use, and treatment of the corporations has convinced courts of their identity. Obviously, here the lease alone does not so prove, or even indicate; in fact, as above seen, it indicates to the contrary. That the president of Chicago Mines was secretary of London Co. and the vice president of London Co. was secretary of Chicago Mines is not sufficient demonstration of identity of corporate entity. As to the idea that depletion deduction is, under section 23 (m), to be equitably apportioned between lessor and lessee, we are shown no authority, and can discover none, to indicate that the statutory statement covers the situation here. We think it was not so intended. We hold that Chicago Co. is not entitled to deduction for depletion from working the American dump.

We next consider the position of London Co. First, is it entitled

to deduction of depletion on the $16,917.23 royalties under the lease to Chicago Co. and covering operations on American dump from about June 10 to October 8, 1940? The respondent contends that the ore dump was not a mine or mineral deposit, and that London Co. did not create it, did not mine or extract from the ground the ore in the dump, having acquired it by quitclaim deed and/or assignment, and not by virtue of its ownership of a one-half interest in the American mine. The petitioner's argument is in essence the same as with reference to Chicago Co. It contends that the ore came from London Co.'s own mine and mining claims, that "the dump ore had come to rest for a time near the collar of the shaft, and its later extraction, sorting, tramming and milling were simply the final stages in the processing-stream which produced the income and hence formed the basis for percentage depletion." This is true, it is asserted, as to the royalties received, even where the lessee is independent of and at arm's length from the owner of the mine. Reliance is primarily placed on the *New Idria Quicksilver*, and *Kennedy Mining* cases, *supra;* also on the *Consolidated Chollar* case, *supra*. The problem on this particular point, as we see it, is whether, though London Co. is the owner of the dump, the fact that the dump was earlier created by Amer Mining Co., which mined and extracted the contents of the dump from underground, precludes allowance of deduction for depletion to London Co. To that company, was the dump a mine, within the statutory term? Though the petitioner points to section 114 (b) (4) (B) as defining "mining" to include "not merely the extraction of the ores or minerals from the ground, but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product," it seems to us that definition does not solve our problem, for it does not indicate whether the one doing the "treatment processes" need be the "mine owner or operator" who extracted ore from the ground. Here Amer Co. had done the extracting, at an earlier date, from about 1930 to May 1940. True, London Co. had at all times been owner of a one-half interest in the American Mining claim on which the mine was located and on which a minor part of the dump was located, and also owned one-half interest in the Fraction claim where the greater portion was piled, and in the Huron claim, where another minor part of the waste ore was located. These three half interests it had owned since prior to the extraction of the ore by Amer Mining Co. Also, it had become by assignment on June 7, 1940, owner of the lease under which Amer Mining Co. had extracted from the mine the ore and the waste material in the dump. Under such circumstances, what is the position of London Co. with respect to right to depletion on royalties received from Chicago Co.? In our opinion, *Atlas Mining Co.* v.

*Jones, supra,* furnishes the answer, and denies the deduction. It is true that there the claimant for depletion had never had any interest in the mine, and, under a lease from the owners of life interest and the remaindermen, it milled tailings previously extracted by a previous lessee, whereas here, London Co. at all times owned a half interest not only in the mine, but in the adjacent claims upon which the larger portion of the waste material from the mine was dumped. Yet, the court pointed out that, "The depletion *of the mine* [italics supplied] took place when the minerals were severed," and that "the resulting loss of capital was suffered by the landowner and the lessee, and not by Atlas," which later milled the tailings. This indicates that any depletion suffered by London Co. as owner of a half interest in the mine took place between 1930 and May 1940 when Amer Co., its lessee, was extracting the ore, and since it is apparent that as lessor during that period London Co. had income from royalties in the same proportion as capital was extracted, no reason appears for allowing depletion in the later years when another lessee, as in the *Atlas* case, milled material previously considered waste. Moreover, the *Atlas* case appears primarily based upon the conclusion that the tailings (ores after severance from natural deposit) were not a mine, under the language of section 23, but were personal property. This was the conclusion in the first opinion, and was not modified on rehearing, though it was there amplified. To hold that the dump here involved was a mine would be to disagree with the *Atlas* opinion; and with it we are in agreement, though it appears contrary to *New Idria Quicksilver Mining Co.* v. *Commissioner, supra,* though it may be that distinction can be seen in the latter case in the fact that the petitioner had purchased the mine itself, after the extraction by previous owners of the dump material mined and discarded by former owners and placed on the mining property purchased, and the stipulation that the deposits of dump ores had at all times been "an unsevered part of the realty on which the mine was located" and "were placed thereon prior to March 1, 1913, and so have never been subjected to any depletion allowances on any returns filed by petitioner or prior owners of the property." We followed the *Atlas* case in *Carl M. Britt,* 43 B. T. A. 254, holding "that the word 'mines' * * * is limited to natural deposits and does not include a tailings dump deposited on the surface of the land, consisting of a residue of ores that had been severed and milled," though there the petitioner who processed the tailings had never had any ownership of any interest therein or in the mine prior to the lease under which the processing was done. We were of the same opinion in the *Consolidated Chollar* case, *supra,* wherein the petitioner acquired property upon which were located dumps of ore-bearing rock taken from mines on adjacent property. We quoted the

*Atlas* case, *supra*, in turn quoting *So. Utah Mines & Smelters* v. *Beaver County*, 262 U. S. 325, as follows:

The tailings severed and removed from the mining claims, changed in character, placed on other and separate lands and having an ascertained and adjudicated value of their own, in our opinion, constituted a unit of property entirely apart from the mine from which they had been taken. See *Forbes* v. *Gracey* 94 U. S. 762, 765.

The petitioner relies also upon *Kennedy Mining & Milling Co. supra*, but in that case, as already noted, the petitioner at all times was owner and operator of the mine and owner of the tailings deposited on its property, and in the *Consolidated Chollar* case, *supra*, we distinguished the *Kennedy* case on that ground, saying:

\* \* \* The economic interest of this petitioner in the tailings and in the minerals to be extracted therefrom was identical with the interest it had maintained through its ownership of the mine from beginning to end of the extractive process; and when it finally received the proceeds of the minerals contained in the tailings it received income from the contents of the mine to exactly the same extent as the income it had previously received from the earlier and more rudimentary refining process. \* \* \*.

Moreover, the pivotal question in the *Kennedy* case was whether "income of the property" under section 114 (b) (4) included income from tailings even though these had previously been availed of in computing unit depletion. We do not think the *Kennedy* case supports the petitioner under the facts here at hand. Nor do we consider that London Co.'s acquisition of the lease of Amer Co., which had done the mining, helps its position, for the dump material had become personal property belonging to the operating lessee, a separate property from that in the mine owners. *London Extension Mining Co.* v. *Ellis*, 134 Fed. (2d) 405, involving the same property as here. The royalty proceeds of processing the waste dump, received from Chicago Co., are not the result of the working of a mine by London Co. We conclude and hold that London Co. may not deduct depletion on the royalties received from Chicago Co.

The next question for our determination is whether London Co may deduct depletion on the income from its own milling, from October 8, 1940, to the end of the year, of the American dump. We think the answer again should be in the negative, for again London Co. is seen in this respect not to be operating a mine. It was operating a separate property, by virtue of acquisition thereof by transfer from the previous owner, and not by virtue of its ownership of a one-half interest in the mine. The facts negative an integrated operation of ore from the vein to the final process. The larger portion of the dump, it is stipulated, was upon the Fraction claim, only one of two smaller portions being on the American claim, on which the producing mine was located. The amount of the dump produced from the American

Mine is not agreed, nor even estimated, except as a small portion. Clearly we think such a situation differs greatly from that in the *Kennedy* case, where the claimant for depletion at all times owned the claim which not only produced the ore but upon which the waste part thereof was dumped. Though London Co. also owned a one-half interest in the Fraction and Huron claims, they must be seen as separate holdings, not forming such a unit with the mine as to demonstrate that waste therefrom could, as in the *Kennedy* case, be considered a part of mine operation, but indicating the opposite, that is, that in operating the dump London Co. was proceeding altogether independently of the mine. We hold that depletion may not be allowed on the results of such operation, from October 8, 1940, to the end of the year.

The next problem presented is as to the treatment of depletion with respect to London Co.'s own underground workings of the American Mine from June 7 to August 20, 1940. There is no question as to depletion being deductible in general on the mined ore, but the respondent's position is that the underground operations must be considered separately, and not as one operation with the dump. From the underground operations considered alone, there was a net loss. Therefore, it contended that no depletion may be deducted on such net loss, the profit from operation of the dump not being properly added to give a net profit upon which to compute percentage depletion. We think the respondent should be sustained, for the same reasons above set forth in denying deduction on operation of the dump. Though in the period now being considered London Co. was operating both in the mine and on the dump, the two may not be viewed as one. It is no mere delay at the collar of the mine, as petitioner argues, of the ore produced from it, so as to demonstrate a unified process, though interrupted by delay. The lessee, Amer Co., which had produced the waste dump, was no longer operating the mine, but had conveyed its property, the waste in the dump, indirectly to London Co. Only by such a conveyance did London Co. secure the right to work the dump. Royalties were payable to the owners of the dump. *London Extension Mining Co.* v. *Ellis, supra.* It was largely on property different from, though contiguous to, the claim on which the mine was operated. The dump and the mine were not one property. Therefore, depletion may not be computed by joining the income from the two, and, there being no net profit from the underground property and operation, no error was committed in denying deduction of depletion.

*Decision will be entered under Rule 50.*