ISLAND CREEK COAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56899.    Filed May 27, 1958.

*Rolla D. Campbell, Esq.,* and *F. A. Macdonald, Esq.,* for the petitioner.

*John C. Calhoun, Esq.,* for the respondent.

This proceeding involves deficiencies in income tax for the calendar year 1951 in the amount of $198,015.65, and for the calendar year 1952 in the amount of $2,558.01. By amended answer, respondent seeks an additional deficiency of $14,139.41 for 1951 and $22,219.63 for 1952.

The issues for decision are: (1) Whether petitioner was entitled to treat its several coal-mining properties as a single property in computing its percentage depletion allowance for 1951 or whether it must use the "separate interests method" as the Commissioner has determined; (2) whether royalty income received by petitioner as a sublessor during 1951 and 1952 under a sublease of coal properties was taxable as a long-term capital gain under section 117 (k) (2) of the 1939 Code, or as ordinary income; (3) whether petitioner, during 1951 and 1952, in computing the net income limitation on its percentage depletion, properly credited its cost account of "Supplies Maintenance"

with amounts received from the sale of mine scrap, thereby reducing the costs directly attributable to mining as reflected by that account; and (4) whether certain charitable contributions made by petitioner during 1951 and 1952, and deducted by it on its returns for those years, constituted deductions attributable to the mineral property, and were therefore to be deducted from gross income in arriving at the net income limitation on its percentage depletion allowance.

### FINDINGS OF FACT.

Some of the facts were stipulated, are so found, and are incorporated herein by this reference.

During the years in issue, the Island Creek Coal Company (hereinafter referred to as the petitioner) was a Maine corporation maintaining general offices at Boston, Massachusetts, and executive offices at Huntington, West Virginia. It filed its income tax return for the calendar year 1951 with the then collector of internal revenue at Boston. It filed its income tax return for the calendar year 1952 with the director of internal revenue at Boston.

### *Issue 1.*

During the taxable years in issue, and in prior years, petitioner was engaged in mining coal from lands in Logan and Mingo Counties, West Virginia. At all times material hereto, its mines were located within one continuous boundary of land. The petitioner owned either a fee or a leasehold estate in one or more seams of coal which underlay the various contiguous tracts of land within that boundary.

During 1951, petitioner's mineral interests were composed of two leasehold estates operated by it under leases from the United Thacker Coal Company and the Cole and Crane Real Estate Trust, and certain freehold estates which it had acquired from time to time since 1915. The entire boundary of its workings was underlaid with several seams of coal, including the Cedar Grove and the Eagle seams. In 1951, petitioner's entire coal production came from within that boundary out of 11 mines, 9 of which produced from the Cedar Grove seam, the remaining 2 producing from the Eagle seam. Due to the contiguous nature of petitioner's interests, the workings of mines originating at portals located on lands held in fee extended into lands operated under both leaseholds, and the workings of the mine originating at a portal located on the lands operated under the United Thacker lease extended into lands held in fee. Certain areas of undeveloped coal were allocated to individual mines by petitioner. However, those allocations were not permanent, but were altered from time to time to suit the convenience and economy of petitioner's operations. The location and extent of the individual mine workings were in no way related to whether the particular coal was held in fee or under a lease.

At all times material hereto, all of petitioner's mines were operated under the general supervision of an operating vice president and a general manager, with offices at Holden, West Virginia. All supervisory functions of shipping, accounting, engineering, planning, coal analysis and research, machinery purchase and maintenance, industrial relations, safety, cost control, and workmen's and unemployment compensation were centralized under the Holden office. All problems relating to sales, allocation of orders for shipment by mines, liability and casualty insurance, general legal matters, and policy direction were handled by the staff of petitioner's president at offices in Huntington, West Virginia.

Petitioner's accounting records with respect to its mining operations were kept on the basis of individual mines, except that a record of the tonnage produced from the leaseholds was maintained for the purpose of computing royalties due the respective lessors. In computing the royalty due on coal produced from a mine located entirely on leased acreage, petitioner allocated the total tonnage of that mine to the leasehold. However, where a mine was located partly on leased lands and partly on fee lands, petitioner estimated the tonnage derived from the leased lands in determining the royalty due.

Because of the similar nature of the coals produced from its various mines, petitioner was able to make them available to customers interchangeably.

In computing its percentage depletion deduction for the years 1932 through 1938, petitioner treated all its mining properties as constituting a single property and this treatment was accepted by the Commissioner. For the years 1939, 1940, and 1941, petitioner similarly computed its percentage depletion allowance. However, on the insistence of the revenue agent who examined its returns for those latter years, petitioner furnished additional information from which its percentage depletion allowance could be computed on each of its separate economic interests. Such interests consisted of 9 properties in 1939, 11 properties in 1940, and 12 properties in 1941. The Commissioner then determined petitioner's percentage depletion should have been computed on its separate economic interests. Petitioner agreed to a settlement for the years 1939, 1940, and 1941, which included a reduction of its percentage depletion deduction for 1939 from the claimed amount of $363,291 to $327,873. Its deduction for 1940 and 1941 remained unchanged, inasmuch as it was the same whether computed on a single property or on each of its separate economic interests.

In computing its 1942 depletion allowance, petitioner treated its several interests as a single property. It submitted no data on its separate economic interests.

Petitioner claimed a percentage depletion deduction of $939,792.86 on its 1943 return, and $1,032,051.81 on its 1944 return. Whether

374

computed on a single property basis or on a separate economic interest basis, the deductions for those years would have been in the claimed amounts. In the schedules attached to its returns for those years, petitioner made the following comments:

With reference to Section 29.23 (m)–13 of Regulations 111, the following information is furnished in connection with the percentage depletion deduction of * * * claimed in the accompanying tax return.

1. All data necessary for the determination of the "gross income from the property" including the amounts paid to lessors as rents or royalties and the price per unit at which royalties were paid may be summarized as follows:

\* \* \* \* \* \* \*

2. All additional data necessary for the determination of the "net income of the taxpayer from the property" may be summarized and described as follows:

In determining the deductions for depletion based on income, this company has in the past consistently followed the rule set out in Section 29.23 (m) (1) (i) of the Regulations which provides:

Where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single "property" provided such treatment is consistently followed.

However, the Revenue Agent has required data supporting the principles laid down in G. C. M.–22956. In order to comply with the Agent's requirements, and reserving the right to apply the provisions of Section 29.23 (m) (1) of the Regulations, the following have been prepared:

Thereafter appeared data necessary for the computation of petitioner's percentage depletion deduction on each of its separate economic interests. Such interests consisted of 12 properties in 1943 and 17 properties in 1944.

On the face of its return for the year 1945, petitioner claimed a percentage depletion deduction of $875,569.45. That figure was computed by taking into consideration the 50 per cent net income limitation on its separate economic interests, composed of 13 properties. Petitioner's deduction computed on a single property basis was $899,822.76. Substantially the same language appeared in the schedules attached to its 1945 return as appeared in the schedules attached to its returns for 1943 and 1944.

On its return for the year 1946, petitioner claimed a percentage depletion deduction of $898,212.42, which was computed by taking into consideration the 50 per cent net income limitation on its separate economic interests, composed of 11 properties. Computed on a single property basis, petitioner's deduction was $923,399.37. It repeated the language appearing in the schedules appended to its 1943 and 1944 returns.

For the taxable year 1947, petitioner claimed on the face of its return a depletion deduction of $1,412,875.94. That figure was computed by taking into consideration the 50 per cent net income limitation on its separate economic interests, composed of 11 properties. Petitioner's deduction on a single property basis was $1,419,907.48.

Once again, it repeated the language appearing in the schedules attached to its 1943 and 1944 returns.

Petitioner claimed a percentage depletion deduction of $1,689,110.64 for 1948, $1,340,857.41 for 1949, and $1,592,306.03 for 1950. In the schedules attached to its returns for those years, it repeated the language appearing in the schedules attached to its 1943 and 1944 returns, and submitted data showing the computation of percentage depletion on the basis of a single property and on its several economic interests. For the first time, it classified its several interests as "Company Owned," "Cole & Crane Lease," and "United Thacker Lease," depending on whether the coal was produced from lands held in fee or under lease. Whether computed on a single or a three-property basis, the deductions for those years were the same as the claimed amounts.

In computing its percentage depletion deduction for 1951, the petitioner treated all its estates in coal under development in Logan and Mingo Counties as constituting a single property. It furnished no data on its several economic interests. Of the coal sold by petitioner during 1951, 47.373 per cent was mined from land owned in fee; 12.713 per cent was mined from the Cole & Crane lease; and 39.914 per cent was mined from the United Thacker lease.

All the coal mined by petitioner during 1951 was produced from 11 mines operated by petitioner, which produced coal from the Cedar Grove seam and from the Eagle seam. The Commissioner, in his determination of the deficiency for 1951, has disallowed $343,-316.03 of the depletion claimed on petitioner's return for that year and has explained his disallowance in the deficiency notice, as follows:

(a) It is determined that you are entitled, as per Exhibit A attached, to a deduction of $3,344,188.49 as depletion in computing your net income for the taxable year ended December 31, 1951. Therefore, the amount of $3,687,504.52 claimed in your return as depletion has been reduced by the excessive deduction of $343,316.03.

In his "Recapitulation on Allowable Depletion" shown on Exhibit A attached to his deficiency notice, the Commissioner sums up his computation as follows:

| | |
|---|---|
| Company owned lands | $1,934,874.89 |
| Cole & Crane lease | 279,491.65 |
| United Thacker lease | 1,063,246.74 |
| Brooke County lease | 9,236.02 |
| Total allowable depletion on coal | 3,286,849.30 |
| Allowable depletion on oil and gas | 57,339.19 |
| Total allowable depletion | 3,344,188.49 |
| Total depletion claimed on return | 3,687,504.52 |
| Decrease | 343,316.03 |

It has been stipulated that:

> If the Court finds that petitioner's treatment of its coal mines as a single property in computing its percentage depletion deduction for 1951 was correct, then petitioner's computation of said deduction for that year shall be taken as correct; but if the Court finds that for such purpose petitioner's coal mines should be treated on some basis other than as a single property, then the amount of petitioner's deficiency on account of unallowable percentage depletion deduction for 1951 shall be as set out in the notice of deficiency, but subject to such changes as may be necessary because of determination of the Court of issues raised by respondent's answer as to the proper treatment of proceeds of sale of certain used and discarded articles and materials and as to allocation of certain contributions.

Whether computed on a single property basis or a separate economic interest basis the percentage depletion deduction of petitioner for the taxable year 1952 is the same. Therefore, for 1952 there is no issue between the parties as to petitioner's percentage deduction for that year.

### Issue 2.

On November 1, 1947, the Brooke County Coal Company (hereinafter referred to as Brooke County) leased to petitioner the right to mine all the coal contained in the Pittsburgh or River seams of coal which underlay a tract of land in Brooke County, West Virginia, for a term expiring December 31, 1962. Petitioner, as lessee, agreed to pay Brooke County a tonnage royalty of 20 cents a ton for each ton of coal mined, and a minimum annual royalty of $3,500. It was further provided that petitioner was liable for all property taxes assessed against the premises, and was obligated to perform other covenants and agreements standard to coal mining leases.

On November 19, 1947, petitioner sublet to the Penowa Coal Company (hereinafter referred to as Penowa) the leasehold estate which it had acquired under its lease with Brooke County, for a term expiring June 30, 1962. Pursuant to that agreement, Penowa agreed to pay petitioner a tonnage royalty amounting to two-thirds of the gross profits earned from its (Penowa's) operations if the coal it produced sold for a monthly average of $5 or more per net ton. If the coal it produced sold for a monthly average of less than $5 per net ton, Penowa agreed to pay petitioner a tonnage royalty of one-third of its gross profits. The sublease further provided for Penowa's assumption of petitioner's obligations under its lease from Brooke County, and for a landlord's lien, the right of forfeiture, and other remedies usually afforded lessors. Petitioner, or its subsidiary, the Island Creek Coal Sales Company, was granted the exclusive right to sell all the coal produced by Penowa under the sublease. A sales commission of 4 per cent of the sales price was to be paid petitioner by Penowa if such sales price was less than $5 per net ton. No com-

mission was payable if the sales price exceeded $5 per net ton. The agreement further provided:

Nothing herein contained shall be deemed to constitute Sublessor and Sublessee as partners or joint adventurers with respect to Sublessee's operations hereunder, as the provisions for sharing the gross margin are made solely for the purpose of fixing the royalty to be paid by Sublessee. All responsibility for carrying on such operations and for the payment of all obligations incurred by Sublessee in connection therewith shall be paid and borne exclusively by Sublessee.

Petitioner received $92,360.24 in 1951, and $12,298.10 in 1952, under the terms of its sublease agreement with Penowa. Those amounts represented royalties on coal mined by Penowa during the respective years. On its returns for 1951 and 1952, petitioner reported those sums as long-term capital gains.

## Issue 3.

Petitioner received $64,872 in 1951, and $62,431 in 1952, from the sale of mine scrap. The scrap thus sold was composed of items such as steel, wire, tipple iron, and other materials recovered from its mines and tipples. All these materials represented waste from articles or supplies whose cost originally had been charged to production costs. In conducting its scrap salvage operations, petitioner would temporarily relieve men from their regular duties, and would assign them to salvage crews. These crews would collect the various items of scrap, classify them, and then haul them away. Periodically, a source of disposal was contacted and the collected scrap was sold. During the years in issue, petitioner incurred substantial costs in recovering scrap which were charged to general operating expenses.

During 1951 and 1952, petitioner maintained a cost account designated "Supplies Maintenance" which reflected the current costs of mine supplies other than capital items. It credited that account with "Recovery Credits" of $64,872 in 1951, and $62,431 in 1952, such being the sums it received from the sale of scrap during those years. No portion of the amounts so credited was realized from the sale of items whose original cost had been charged to capital. After reducing the "Supplies Maintenance" account by the "Recovery Credits," petitioner then deducted the debit balance of that account from its gross income from mining in order to compute the net income limitation on its percentage depletion allowance for the years in issue.

## Issue 4.

During the years in issue, petitioner made contributions to various local and national charitable organizations and institutions. A majority of these contributions were made to organizations located in

the area of its operations. On its returns for those years it claimed a deduction for this class of contributions in the amount of $33,943 for 1951 and $21,305.50 for 1952. However, it concluded that those contributions were not related to its mining activities and, therefore, did not allocate them to its cost of mining for purposes of determining the net income limitation on its percentage depletion allowance. Petitioner also, in the taxable years 1951 and 1952, made numerous contributions to other charitable organizations which it charged to mining costs in computing percentage depletion. The treatment of this latter class of contributions is not in issue in this proceeding.

OPINION.

BLACK, *Judge:* Respondent makes the following concession in his brief:

Respondent concedes that for the taxable years 1951 and 1952, the respective amounts of $74,368.07 and $12,298.10, allegedly received as commissions on the sales of coal under the sublease agreement with Penowa Coal Company, as set forth in respondent's amendment to answer, do not represent commissions on the sales of coal. Consequently, respondent's original determination in which he considered such amounts as royalties and allowed a deduction for percentage depletion with regard thereto, is correct.

*Issue 1.*

From 1932 through 1938, petitioner treated all its mining properties as constituting a single property for percentage depletion purposes. Clearly it was entitled to do so, since it owned an interest in mineral properties, located within a single tract or parcel of land, the income from which had been consistently treated by it as arising from a single property in computing its percentage depletion allowance. *Helvering* v. *Jewel Mining Co.*, 126 F. 2d 1011 (C. A. 8, 1942). For the years 1939, 1940, and 1941, petitioner similarly computed percentage depletion on the properties in question. However, on the insistence of the internal revenue agent who examined its returns for those years, petitioner furnished additional information from which its percentage depletion allowance could be computed on each of its separate economic interests. The Commissioner then determined its percentage depletion allowance should have been computed on its separate economic interests. Petitioner agreed to a settlement for the years 1939, 1940, and 1941, which included a reduction of its percentage depletion deduction from the claimed amount of $363,291 to $327,873. Its deduction for 1940 and 1941 remained unchanged, inasmuch as it was the same whether computed on a single property or on each of its separate economic interests.

In computing its 1942 depletion allowance, petitioner treated its several interests as a single property. It submitted no data on its

separate economic interests. The record is silent as to whether the single or the separate economic interests method would have produced a larger deduction for that year. We, therefore, assume that either method would have resulted in the same deduction.

With its returns for the years 1943 and 1944, petitioner submitted schedules showing the computation of depletion on the basis of its separate economic interests as enumerated in the data submitted for 1939, 1940, and 1941. In neither of the years 1943 or 1944 did the depletion deduction differ, whether the areas in question were considered as several properties or as one property.

In its Federal income tax return for the taxable year 1945, petitioner claimed percentage depletion on its return of $875,569.45, which was computed by taking into consideration the 50 per cent net income limitation on its several economic interests. Had petitioner claimed percentage depletion on a single property basis the amount would have been $899,822.76.

Similarly, for the taxable year 1946, petitioner claimed depletion on its return based on its several separate properties in the amount of $898,212.42. Depletion at 5 per cent on a single property basis would have been $923,399.37.

For the taxable year 1947, petitioner claimed on its return a depletion deduction of $1,412,875.94. That figure was computed by taking into consideration the 50 per cent net income limitation on its separate economic interests, composed of 11 properties. Petitioner's deduction on a single property basis was $1,419,907.48.

On Sheet 1 of the schedules attached to its 1945, 1946, and 1947 returns petitioner used substantially the same language which appeared on the schedules attached to its returns for 1943 and 1944. Our Findings of Fact give this language and it need not be repeated here.

For the taxable years 1948 through 1950, the deductions for depletion, whether computed on the separate economic interests basis or the single property basis, were the same. It was in these years that petitioner first submitted information allowing for computation of allowable depletion based on only three properties, company owned lands in fee, the Cole & Crane lease, and the United Thacker lease.

In computing its percentage depletion deduction for 1951, petitioner treated all its estates in coal under development in Logan and Mingo Counties as constituting a single property. It furnished no data on its several economic interests. Respondent disallowed the use of the single property method, computed petitioner's depletion on the separate economic interests method, and determined the deficiency accordingly.

In support of his determination that petitioner was not entitled to treat its several coal mining interests as a single property for the

purposes of computing its 1951 percentage depletion allowance under section 114 (b) (4) of the 1939 Code, respondent relies on section 29.23 (m)–1 (*i*) of Regulations 111.[1] He contends that for a taxpayer to be entitled to treat its several mineral interests as a single property under the aforementioned regulations, it must show that it owns an interest in the properties, that the properties are physically located within a single tract or parcel of land, and that the income from those properties has been *consistently* treated by it as arising from a single property in computing its percentage depletion allowance. While, in effect, conceding petitioner has met the conditions of ownership and geographical location required in the regulations, respondent maintains the income from its several interests has not been consistently treated by petitioner as arising from a single property. He, therefore, concludes petitioner's percentage depletion allowance for 1951 should have been computed with reference to its three separate properties rather than on a single property, relying principally upon *Buffalo Chilton Coal Co.*, 20 T. C. 398 (1953).

Petitioner, on the other hand, contends it has satisfied all the requirements of the regulations, including that of consistency. It argues that the respondent has erroneously considered it to have computed its depletion allowance for 1945 and 1946 [2] on its separate properties, even though the deduction claimed on its returns for those years was the result of such a computation, since it expressly reserved the right, in schedules attached to its tax returns for each of those years, to treat its several coal mining interests as a single property under the applicable regulations. It concedes that the final result of its 1939 return was the computation of depletion on its separate properties, but contends that represented a settlement and not an initial filing. In any event, it claims the requirement of consistency was adopted to prevent a taxpayer from annually electing the most advantageous method of computing percentage depletion, and that here, during the years in which its interests were treated as separate properties, the advantage was to the respondent, and, therefore, petitioner cannot be said to have shifted its position to suit its own convenience, and should not now be penalized. For reasons hereinafter set forth, we agree with the petitioner.

The courts have uniformly held section 29.23 (m)–1 (*i*) of Regulations 111, which affords a taxpayer the option of treating its several

---

[1] Sec. 29.23 (m)–1. Depletion of Mines, Oil and Gas Wells, Other Natural Deposits, and Timber ; Depreciation of Improvements.—

\* \* \* \* \*

(*i*) "The property," as used in section 114 (b) (2), (3), and (4) and sections 29.23 (m)–1 to 29.23 (m)–19, inclusive, means the interest owned by the taxpayer in any mineral property. The taxpayer's interest in each separate mineral property is a separate "property" ; but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single "property," provided such treatment is consistently followed.

[2] And presumably 1947 as well.

mineral properties as a single property providing such treatment is consistently followed, to be a reasonable interpretation of the statute as applied to mineral properties. *Helvering* v. *Jewel Mining Co., supra; Buffalo Chilton Coal Co., supra; Amherst Coal Co.,* 11 T. C. 209 (1948) ; *Black Mountain Corporation,* 5 T. C. 1117 (1945). We are in complete accord with those decisions, but note that none of them involved a taxpayer whose only departure from consistency was at the instance of the Commissioner and to its economic disadvantage. There can be no doubt but that petitioner, for the years 1932 to 1938, inclusive, consistently computed its percentage depletion on the single property basis. We do not understand that respondent disputes that fact. It was as to 1939 that respondent insisted on a change to which petitioner finally consented in an agreed settlement for 1939, 1940, and 1941.

Thereafter petitioner, by virtue of schedules attached to its returns, evidenced a consistent desire to adhere to the single property method of computing its percentage depletion allowance in each of the years 1943 through 1950. At the very least, we consider those schedules to constitute a disagreement by petitioner to the use of the method proposed by the Commissioner in his determination for the years 1939, 1940, and 1941. More particularly, and this we believe to be the crucial fact of record, in each of the years wherein petitioner computed its depletion allowance on the basis of its separate properties, it was to its economic disadvantage to do so, i. e., $24,253.31 in 1945; $25,186.95 in 1946; and $7,031.54 in 1947. In each of those years, petitioner accepted the lesser amount, when, it seems clear to us, it could have sought judicial approval of the single property method. Not once did the separate property method result in a greater deduction for the petitioner than it would have been entitled to take under the single property method. In our judgment, those facts do not constitute the type of departure from consistent treatment contemplated by the regulations. We are in accord with petitioner's contention that the requirement of consistency was adopted to prevent a taxpayer from annually electing the most advantageous method of computing percentage depletion, and since that is certainly not the case here, we are unable to conclude petitioner has violated the administrative prohibition.

It seems to us that in filing its return for 1951 and computing its percentage depletion for that year on the single property basis, petitioner was simply resuming the method which it had consistently followed from 1932 to 1938 and from which it never willingly departed. At all times it was apprising the Commissioner by statements made in its returns that it considered it had the right to take depletion on the single property basis. On this issue for 1951, the petitioner is sustained. There is no such issue for 1952.

## *Issue 2.*

The second issue relates to whether the royalty income petitioner received under its sublease agreement with the Penowa Coal Company constituted ordinary income, as determined by respondent, or capital gains within the meaning of section 117 (k) (2) of the 1939 Code,[3] as amended by section 325 of the Revenue Act of 1951.

Petitioner's argument is that Congress, in amending section 117 (k) (2), intended to extend the benefits of that section to anyone possessing an estate or an interest in coal. It maintains that under the laws of West Virginia a leasehold estate in coal, such as it possessed by virtue of its lease from Brooke County, conferred upon it all the "indicia and attributes of ownership." It, therefore, concludes that it was an "owner" of coal within the intended meaning of the statute, and entitled to treat the amounts received under its sublease of that coal as capital gains. We do not agree.

Section 325 of the Revenue Act of 1951 amended section 117 (k) (2) of the 1939 Code, thereby extending to the recipients of coal royalties the capital gains treatment already available to the recipients of timber royalties under that section. In the Senate Finance Committee Report which accompanied the 1951 Act the following comments were made with reference to section 325 : [4]

Section 325 of your committee's bill * * * provides tax relief for the recipients of coal royalties. Most leases on coal properties are long-term and call for royalty payments expressed in cents per ton. Therefore, the lessor does not receive the automatic adjustment for price changes which occurs when a royalty is expressed as a percentage of the value of the mineral extracted from the property. Many of the existing coal leases are old and their royalty payments are small.

         \*         \*         \*         \*         \*         \*         \*

This section extends to the recipients of coal royalties the capital gains treatment now available to timber under section 117 (k) (2) of the code. It is intended

---

[3] SEC. 117. CAPITAL GAINS AND LOSSES.

   (k) GAIN OR LOSS IN THE CASE OF TIMBER OR COAL.—

     \*        \*        \*        \*        \*        \*        \*

   (2) In the case of the disposal of timber or coal (including lignite), held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber or coal, the difference between the amount received for such timber or coal and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber or coal. Such owner shall not be entitled to the allowance for percentage depletion provided for in section 114 (b) (4) with respect to such coal. This paragraph shall not apply to income realized by the owner as a co-adventurer, partner, or principal in the mining of such coal. The date of disposal of such coal shall be deemed to be the date such coal is mined. In determining the gross income, the adjusted gross income, or the net income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this paragraph. This paragraph shall have no application, in the case of coal, for the purposes of applying section 102 or subchapter A of chapter 2 (including the computation under section 117 (c) (1) of a tax in lieu of the tax imposed by section 500).

[4] S. Rept. No. 781, 82d Cong., 1st Sess. (1951), pp. 42–43.

by this provision of your committee's bill that coal royalties receive the same treatment as timber royalties. In the case of timber coming under this section, percentage depletion is not allowed, and it also is not to be available in the case of these coal royalties.

\*  \*  \*  \*  \*  \*  \*

In order to differentiate a lessor entitled to receive royalties from a person participating in the operation of a mine, the provisions of the House bill are inapplicable if the owner of the coal is "personally obligated to pay a share of the cost of mining operations." Since lessors who have no interest in the operating profits of a mine may nevertheless pay real estate taxes, exploration expenses, or other expenses, your committee's bill provides, instead, that those provisions shall be inapplicable to "income realized by the owner as a co-adventurer, partner, or principal in the cutting of such timber or the mining of such coal."

It is also made clear that these provisions do not apply to a lessee, and that the term "coal" includes lignite.

A reading of the above language convinces us that Congress used the term "owner" in its commonly understood sense, and did not include those occupying the position of sublessor. In relation to Brooke County, petitioner was a lessee; and in relation to Penowa, it was a sublessor. Therefore, it seems to us that petitioner, as a sublessor, was not entitled to the benefits of section 117 (k) (2) for the years 1951 and 1952 with respect to the royalty income received from Penowa.[5]

In 1955–2 C. B. 277, is printed a ruling (Rev. Rul. 55–621) which reads as follows:

Section 117 (k) (2) of the Internal Revenue Code of 1939, relating to gain or loss upon the disposal of timber or coal (including lignite), is not applicable to a sublessor (or lessee-assignor) of coal properties. However, effective with respect to taxable years beginning after December 31, 1953, and ending after August 16, 1954, the provisions of section 631 (c) of the Internal Revenue Code of 1954, corresponding, in the case of coal, to the provisions of section 117 (k) (2) of the 1939 Code, may apply to any person who owns an economic interest in coal in place, including a sublessor. Under section 117 (k) (2) of the 1939 Code and section 631 (c) of the 1954 Code, an assignee or other successor in interest to the original lessor of coal properties may be entitled to the benefits of the statute to the same extent as such original lessor.

Petitioner strongly argues that the Commissioner cannot make a ruling contrary to the statute and that the above-mentioned ruling of the Commissioner is not correct and that as a sublessor it is fully entitled under the provisions of section 117 (k) (2) of the 1939 Code to treat its royalties received from Penowa in 1951 and 1952 as capital gains. We, of course, agree with petitioner that the Commissioner has no power to make a ruling which is contrary to the statute. If he does so, it is a nullity. However, we are not convinced that the Commissioner erred in his ruling aforesaid. It was in harmony with this ruling that, in his deficiency notice here involved, he made his deter-

[5] Section 631 (c) of the 1954 Internal Revenue Code extended the benefits of 117 (k) (2) to "any person who owns an economic interest in the coal in place, including a sublessor."

mination with reference to the royalties which petitioner received from Penowa. After a careful consideration of this issue, we sustain the Commissioner.

## Issue 3.

The third issue relates to the income petitioner received from the sale of mine scrap, and whether it properly credited that income to the costs of mining. During 1951 and 1952, petitioner charged the cost of all mine supplies it purchased, other than capital equipment, to its "Supplies Maintenance" account. During those years it sold as scrap certain items recovered from its mines such as steel, wire, and miscellaneous tipple iron, whose cost had originally been charged to that account. In arriving at the net income limitation on its percentage depletion deduction, petitioner reduced its gross income from the property by the debit balance of its "Supplies Maintenance" account. However, before making that reduction, petitioner credited "Supplies Maintenance" with "Recovery Credits" of $64,872 in 1951, and $62,431 in 1952, which represented the income it received from the sale of scrap during those years. By amended answer, respondent now contends the net effect of that credit was to include in gross income from mining the sale proceeds of scrap, an action not warranted by the statute. *Big Four Oil & Gas Co.* v. *United States*, 118 F. Supp. 958 (1954); *Monroe Coal Mining Co.*, 7 T. C. 1334 (1946). Petitioner, on the other hand, maintains it was merely computing net income on the basis of net costs, which it submits is a commonly accepted accounting practice.

Section 114 (b) (4) (A) of the 1939 Code provides a percentage depletion allowance for coal of 10 per cent of the "gross income from the property," but in any event "not [to] exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property." We think it is clear that "gross income from the property" has reference only to the income attributable to those mining operations defined by the statute, and does not include miscellaneous income derived from the sale of scrap collected about the mining premises. *Big Four Oil & Gas Co.* v. *United States, supra; Monroe Coal Mining Co., supra.* We are of the opinion that the end result of the petitioner's attempt to credit its current costs of mining with income received from the sale of scrap was the inclusion in "gross income from the property" of the sale proceeds of that scrap, and that, as we have already noted, may not be done. It is axiomatic that a taxpayer may not do by indirection that which it may not do directly. We hold, therefore, that the proceeds of the sale of scrap realized by the petitioner during 1951 and 1952 were not properly credits to

its "Supplies Maintenance" account during those years in determining the net income limitation and its percentage depletion allowance.

Petitioner's argument that it is an accepted accounting practice to determine net income on the basis of net costs overlooks the distinction between net income for the purposes of the limitation on percentage depletion, and net income for the general purposes of the Code. The former is a term to be construed in the light of the regulations and the statute, while the latter is subject to a much broader interpretation.

*Issue 4.*

The last issue for our consideration involves respondent's allegation that portions of petitioner's charitable contributions for the years 1951 and 1952 constituted "allowable deductions attributable to the mineral property upon which the depletion is claimed," and therefore should have been deducted from "gross income from the property" in computing the net income limitation on percentage depletion. Since respondent raised this issue by amended answer, he bears the burden of proof.

What we said recently in *United States Potash Co.*, 29 T. C. 1071 (1958), disposes of respondent's contentions. In concluding that the contributions there in question were not attributable to the mineral property, we said:

This Court has held that charitable contributions deductible under section 23 (q) are not "attributable to the mineral property" and are not to be deducted in computing "net income * * * from the property" for the purpose of section 114 (b) (4). *F. H. E. Oil Co.*, 3 T. C. 13, affirmed on other issues 147 F. 2d 1002, and it follows that authority here. The Commissioner contends that the holding in that case is wrong and should be overruled, but the cases he cites are not in point since they all involve deductions of real business expenses or other items which were deductible because essential to the mining operation. Charitable deductions are gifts, voluntarily made, and not expenses of or essential to the mining operation. * * *

The same kind of charitable contributions as was involved in the *United States Potash Co.* case, *supra*, is involved here. Hence that case is controlling. It is true that petitioner did make some charitable contributions during each of the taxable years which were attributable to its mining operations. These, however, are not involved here. The charitable contributions here involved are those of a general nature such as were involved in the *United States Potash Co.* case. The Commissioner's prayer for an increase in the deficiency based on these charitable contributions here involved is denied.

*Decision will be entered under Rule 50.*