*Decision will be entered under Rule 50.*

L. B. MAYTAG, AND ESTATE OF CATHERINE B. MAYTAG, DECEASED, LEWIS B. MAYTAG AND THE FIRST NATIONAL BANK OF COLORADO SPRINGS, COLORADO, EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69521. Filed April 30, 1959.

*William A. McDonald, C.P.A.*, for the petitioners.
*William J. McNamara, Esq.*, for the respondent.

FISHER, *Judge:* This proceeding involves deficiencies in income tax determined against petitioners as follows:

| Year | Amount |
|------|--------|
| 1953 | $145.92 |
| 1954 | 11.32 |

Petitioners claim overpayments in income tax in amounts as follows:

| Year | Amount |
|------|--------|
| 1953 | $2,908.92 |
| 1954 | 82.80 |

The principal issues presented for our decision herein are (1) whether petitioners incurred a deductible loss in the amount of $5,000, or any portion thereof, during the taxable year 1953 upon the abandonment of an oil and gas lease; and (2) whether petitioners, nondealers in securities and real estate, may deduct the amounts of $347.40 and $916.50, representing the cost of Federal documentary stamp taxes paid in the taxable years 1953 and 1954, respectively, in connection with the sale of rental property and corporate stocks, as ordinary and necessary business or nonbusiness expenses under sections 23(c)(1)(F), Code of 1939, and 164(b)(3), Code of 1954.

### FINDINGS OF FACT.

#### I.

Some of the facts are stipulated and, as stipulated, are incorporated herein by this reference.

Petitioners are an individual and the estate of his deceased wife, Catherine B. Maytag. During the taxable years 1953 and 1954, petitioners resided at Broadmoor, Colorado Springs, Colorado. They filed joint income tax returns for those years on a cash basis with the

director of internal revenue for the district of Colorado. Catherine B. Maytag died in August 1954.

For simplicity, Catherine B. Maytag, rather than her estate, will be referred to as a petitioner, and she and her husband will hereinafter be called petitioners.

L. B. Maytag is a retired manufacturer who is not presently engaged in any business activities on a full time basis. He is a director of several corporations, has some ranch and real estate holdings, and has participated in several oil ventures.

In June 1947, petitioners, through James L. Taylor, paid a lump sum amount of $5,000 for an undivided one-half interest in 2 oil and gas leases, known as the "Ownbey" and "Colorado," and assignments of 3 Federal oil and gas leases to be acquired from the United States of America through the Bureau of Land Management, Department of Interior. All of said property was located in Park County, Colorado. At the time of acquisition of the interests in said leases by petitioners, the tracts covered by said leases consisted of a total of approximately 6,715 acres which were contiguous and formed a continuous boundary.

The first of the leases (an interest in which was assigned to petitioners in 1947), hereinafter called the Ownbey lease, was entered into on May 3, 1946, by and between John L. and Irene Ownbey, as lessors, and R. W. Kramer, as lessee. The Ownbey lease covered approximately 3,200 acres of land, and ran for a primary term of 5 years.

On May 14, 1946, R. W. Kramer assigned approximately 1,280 acres of property included in the Ownbey lease to C. C. Rasmussen. On June 13, 1947, C. C. Rasmussen, "in consideration of One Dollar (and other good and valuable considerations)," assigned all of his right, title, and interest in the 1,280 acres of property included in the Ownbey lease to the petitioners. Petitioners made all payments by check to C. C. Rasmussen but all dealings were made directly with Taylor. On May 28, 1951, petitioners surrendered all of their interest in the 1,280 acres of property included in the Ownbey lease to John L. and Irene Ownbey.

The second of the leases assigned to petitioners in June 1947, hereinafter called the Colorado lease, was entered into on May 1, 1946, by and between the State of Colorado, as lessor, and C. C. Rasmussen, as lessee. The lease covered approximately 2,240 acres of land and ran for a primary term of 5 years.

On June 11, 1947, Rasmussen assigned all of his right, title, and interest in the Colorado lease to petitioners. In 1950, the Colorado lease was allowed to lapse for nonpayment of rental due November 1, 1950.

On February 1, 1948, Clifford L. Feldt, as lessee, entered into a lease agreement with the United States of America as lessor, through the

Bureau of Land Management, Department of Interior, under which the lessee obtained the exclusive right and privilege for a period of 5 years to drill for and extract oil and gas deposits on approximately 876.8 acres of land situated in Park County, Colorado. On February 1, 1953, said lease, D–053968, was canceled for nonpayment of rental for the year commencing February 1, 1953.

Likewise, on February 1, 1948, Rasmussen, as lessee, entered into a lease agreement with the United States of America, as lessor, which contained substantially the same provisions as lease D–053968, under which the lessee obtained the exclusive right and privilege to drill for and extract oil and gas deposits on approximately 2,240 acres of land situated in Park County, Colorado. On December 27, 1950, said lease, D–053969, was canceled for nonpayment of rental for the year commencing February 1, 1951.

Also, on February 1, 1948, Rasmussen, as lessee, entered into a lease agreement with the United States of America, as lessor, which contained substantially the same provisions as lease D–053968, under which the lessee obtained the exclusive right and privilege to drill for and extract oil and gas deposits on approximately 78.44 acres of land situated in Park County, Colorado. On December 27, 1950, said lease, D–054041, was canceled for nonpayment of rental for the year commencing February 1, 1951.

Petitioners executed no written cross-assignments of any portion of their interest in the Ownbey and Colorado leases. Feldt and Rasmussen executed no written assignments or cross-assignments of any portion of their respective interests in Federal leases D–053968, D–053969, and D–054041. No agreements of the kind known in the oil and gas industry as unitization agreements were entered into by petitioners with respect to development of the Ownbey and Colorado leases nor the Federal oil and gas leases.

From the beginning of the transaction whereby the 5 leases were acquired by petitioners and Taylor, they had a verbal understanding that they would share in the profits on a 50-50 basis of any oil that might be discovered under the entire tract which covered approximately 6,715.24 acres.

Petitioners never allocated their aggregate cost to the 5 leases on any basis. There was never any drilling done on any part of said acreage by petitioners or Taylor.

During the years 1947 to 1951, inclusive, when one-half of the delay rental became due on the Ownbey, Colorado, and Federal Government leases, the amounts due were paid by petitioners as follows:

| Year | Ownbey and Colorado leases | Federal leases |
|------|----------------------------|----------------|
| 1947 | $140 | ------- |
| 1948 | 600 | ------- |
| 1949 | 600 | ------- |
| 1950 | 460 | $110.00 |
| 1951 | --- | 109.63 |

During 1947 to 1951, inclusive, one-half of the delay rental becoming due on the Ownbey, Colorado, and Federal Government leases was paid by James Taylor as follows:

| Year | Ownbey and Colorado leases | Federal leases |
|------|---------------------------|----------------|
| 1947 | $140 | |
| 1948 | 600 | |
| 1949 | 600 | |
| 1950 | 460 | $109.25 |
| 1951 | | 109.62 |

Prior to and including the taxable year 1953, petitioners did not claim any deduction on their Federal income tax returns with respect to the loss sustained when the 5 underlying leases, mentioned above, were surrendered or allowed to lapse. In their petition, for the first time, petitioners claimed a loss in the amount of $5,000 for the taxable year 1953 allegedly due to the abandonment of the aforesaid leases, and, therefore, claimed a refund in the amount of $2,908.92.

The basis to petitioners of the lease canceled in 1953 was $652.77.

## II.

During the taxable year 1953, petitioners paid a total of $347.40 in Federal documentary stamp taxes, of which the sum of $286.90 was applicable to sales of dividend-paying corporate stock, and $60.50 was applicable to the sale of real estate held for rental purposes. Said amounts of tax were deducted as a business expense in petitioners' 1953 income tax return. During the taxable year 1954, petitioners paid the amount of $916.50 in Federal documentary stamp taxes, all of which was paid in connection with the sale of dividend-paying corporate stock. Likewise, said amount of tax was deducted as a business expense in petitioners' 1954 income tax return.

Respondent, in his notice of deficiency, disallowed the aforesaid deductions in each of the taxable years as ordinary and necessary expenses, but took into account the amounts expended as an adjustment reducing the gain on the sale of capital assets, resulting in a net decrease in recognized capital gain for the taxable years 1953 and 1954 in the amounts of $173.70 and $458.25, respectively.

Petitioners were not dealers in securities or real estate during either of the taxable years 1953 and 1954. The parties have stipulated that if the deduction sought by petitioners for Federal documentary stamp taxes is allowed as a business or nonbusiness expense, the additional deduction allowed in adjustments (e) of Schedule 1 and (b) of Schedule 4 of the statutory notice of deficiency will be eliminated from the computation of petitioners' income tax liability.

OPINION.

## I.

The first issue for our consideration involves the allowance, in whole or in part, of a loss in the aggregate amount of $5,000 claimed by petitioners to have been incurred in the taxable year 1953 when the last of 5 oil and gas leases was canceled or surrendered. Petitioners contend that they acquired, for a single lump-sum payment of $5,000, an interest in 5 oil and gas leases, which either constituted a single property or should be so treated for income tax purposes under section 23(e)(2), Code of 1939, and Regulations 111, sections 29.23(e)-3 and 29.23(m)-1-(i), and Regulations 118, sections 39.23(e)-3 and 39.23(m)-1(i).[1]

Respondent takes the position that petitioners' losses were incurred and were deductible in the respective years in which the underlying leases were canceled or surrendered, and that the aggregate loss of $5,000 was not allowable in 1953, the year in which the final lease was canceled, the other leases having been canceled or abandoned in prior

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

\* \* \* \* \* \* \*

(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; \* \* \*

Regs. 111.

SEC. 29.23(e)-3. LOSS OF USEFUL VALUE.—When, through some change in business conditions, the usefulness in the business of some or all of the capital assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis (adjusted as provided in section 113(b) and sections 29.113(a)(14)-1 and 29.113(b)(1)-1 to 29.113(b)(3)-2, inclusive) and the salvage value of the property. \* \* \*

\* \* \* \* \* \* \*

SEC. 29.23(m)-1. DEPLETION OF MINES, OIL AND GAS WELLS, OTHER NATURAL DEPOSITS, AND TIMBER; DEPRECIATION OF IMPROVEMENTS.—Section 23(m) provides that there shall be allowed as a deduction in computing net income in the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements. Section 114 prescribes the bases upon which depreciation and depletion are to be allowed.

\* \* \* \* \* \* \*

(i) "The property," as used in section 114(b)(2), (3), and (4) and sections 29.23(m)-1 to 29.23(m)-19, inclusive, means the interest owned by the taxpayer in any mineral property. The taxpayer's interest in each separate mineral property is a separate "property"; but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single "property," provided such treatment is consistently followed.

Regs. 118.

Sec. 39.23(e)-3 Loss of useful value. (a) When, through some change in business conditions, the usefulness in the business of some or all of the assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis (adjusted as provided in section 113(b) and §§ 39.113(a)(14)-1 and 39.113(b)(1)-1 to 39.113(b)(4)-1, inclusive) and the salvage value of the property. \* \* \*

\* \* \* \* \* \* \*

Sec. 39.23(m)-1 Depletion of mines, oil and gas wells, other natural deposits, and timber; depreciation of improvements. (a) Section 23(m) provides that there shall be

years. We agree with respondent's position on this issue for the reasons hereinafter stated.

The burden of proof is upon the petitioners, since they claim a loss deduction, to establish their right to the deduction and the amount thereof. *Green* v. *Commissioner*, 133 F. 2d 76 (C.A. 10, 1943), affirming a Memorandum Opinion of this Court dated June 12, 1942; *C. H. Goodwin*, 9 B.T.A. 1209 (1928). It is fundamental, of course, that the extent of allowable deductions from gross income for the purpose of income taxation is dependent upon legislative grace; that only where there is clear statutory provision therefor may any particular deduction be allowed; and that a taxpayer claiming a deduction bears the burden of proving the facts on the basis of which such deduction is allowable under the applicable statutory provision. *New Colonial Co.* v. *Helvering*, 292 U.S. 435 (1934); *United States* v. *Akin*, 248 F. 2d 742 (C.A. 10, 1957); *Chicago Mines Co.* v. *Commissioner*, 164 F. 2d 785 (C.A. 10, 1947, affirming 7 T.C. 1103 (1946)).

Section 23(e) of the Internal Revenue Code of 1939, on which petitioners rely, provides that, in computing net income there shall be permitted deduction of individual losses "sustained during the taxable year" and not compensated for by insurance or otherwise. The interpretative regulations promulgated pursuant to this section, mentioned hereinabove, provide that a loss, to be deductible, "must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed." Whether the loss which the taxpayer seeks to deduct is deductible during the taxable year is primarily a question of fact controlled by the circumstances in the particular case. *Boehm* v. *Commissioner*, 326 U.S. 287 (1945), rehearing denied 326 U.S. 811 (1946).

In the instant case, it is stipulated that 4 of the 5 leases in controversy were canceled or surrendered separately in years prior to the taxable year 1953. Nevertheless, it is petitioners' position that the 5 leases constituted a single "property," under their construction of the regulations set forth in footnote 1, *supra*, and, hence, that the total cost of $5,000 was deductible under section 23(e) in the taxable year 1953 when, according to their contention, "the property" was com-

---

allowed as a deduction in computing net income in the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements. Section 114 prescribes the bases upon which depreciation and depletion are to be allowed.

\* \* \* \* \* \*

(1) "The property," as used in section 114(b)(2), (3), and (4) and §§ 39.23(m)–1 to 39.23(m)–19, inclusive, means the interest owned by the taxpayer in any mineral property. The taxpayer's interest in each separate mineral property is a separate "property"; but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single "property," provided such treatment is consistently followed.

Note: Regulations 118 are applicable to taxable years beginning after December 31, 1951.

pletely and permanently given up in its entirety upon the cancellation of the last of the underlying leases, i.e., Federal lease D–053968.

Petitioner relies heavily upon the language of section 29.23(m)–1(i) of Regulations 111 and section 39.23(m)–1(i) of Regulations 118 (see footnote 1, *supra*) to the effect that "[t]he property," as used in section 114(b)(2), (3), and (4), means the interest owned by the taxpayer in any mineral property; that taxpayer's interest in each separate property is a separate "property," but that where 2 or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single "property" provided such treatment is consistently followed.

Assuming *arguendo* (although we do not think that petitioners have established the fact) that the 5 mineral properties in which petitioners had an interest were consistently treated as a single property, we do not think the provisions of the regulations support petitioners' contention. Here, our problem relates to losses on abandonment, cancellation, or termination of the leases. Section 114(b)(2), (3), and (4) referred to in the regulations relates solely to depletion, an entirely different concept. There is no suggestion in the regulations that the 5 interests may be treated as one for the purpose of determining the year or years of loss on abandonment, cancellation, or termination, especially where, as here, those events severed the respective interests abandoned, canceled, or terminated, in different years, from any conceptual whole or single interest. Moreover, section 29.23(e)–3 of Regulations 111 and section 39.23(e)–3 of Regulations 118 (footnote 1) relating to loss of useful value under circumstances similar to those here under consideration, lead to the contrary conclusion and support the view that a loss deduction is to be taken in the year in which the loss occurred.

We find no authority which supports petitioners' contention, and, in our opinion, *Oliver Iron Mining Co.*, 13 T.C. 416 (1949), is controlling to the contrary. In that case, the taxpayer was the sublessee of 12 iron ore properties leased in 1903. In 1914, the taxpayer purchased its lessor's interest in the 12 leases, and, with the exception of one lease which was terminated in the taxable year 1939, extracted oil from the various properties. The portion of the total purchase price allocable to each lease was reflected on the taxpayer's books. On its 1939 return, the taxpayer sought to deduct the cost of the lease abandoned in that year, and included the entire cost of said lease. The respondent contended that no part of the purchase price of the 12 leases was allocable to the lease abandoned in 1939, but that the 1914 contract was a unitary contract covering all of the properties embraced therein, and the cost of all must be recovered through de-

pletion. Holding that the taxpayer was entitled to deduct the cost of the separate lease in the year when the loss was actually sustained, we said (p. 418):

The unrecovered cost of a lease is deductible as a loss when a lease is terminated under circumstances similar to those here present, and the Commissioner has recognized this rule by allowing a part of the loss. *Oliver Iron Mining Co.*, 10 T.C. 908; *Berkshire Oil Co.*, 9 T.C. 903; *Henry C. Rowe*, 19 B.T.A. 906. A lump sum purchase price should be allocated to the several leases for the purpose, *inter alia*, of computing loss upon termination of a lease, unless such allocation is wholly impracticable. *Berkshire Oil Co., supra; Nathan Blum*, 5 T.C. 702; *Searles Real Estate Trust*, 25 B.T.A. 1115; *Biscayne Bay Islands Co.*, 23 B.T.A. 731. * * *

See also *Sneed* v. *Commissioner*, 119 F. 2d 767 (C.A. 5, 1941) affirming 40 B.T.A. 1136 (1939).

Petitioners stress *Berkshire Oil Co.*, 9 T.C. 903 (1947). In that case, two contiguous tracts were treated as one separate property, as distinguished from two other noncontiguous tracts. The two contiguous tracts, however, were both released to the lessor in the same year, and the loss was allowed in that year. An allocation of cost between the two contiguous lots had no significance in relation to the issue there involved. To the extent of the issue actually determined (deduction of the loss in the year of release), the case is in no sense in conflict with the principles which we follow in the instant proceeding.

Petitioner also relies upon *Helvering* v. *Jewel Mining Co.*, 126 F. 2d 1011 (C.A. 8, 1942), reversing 43 B.T.A. 1123 (1941); *Island Creek Coal Co.*, 30 T.C. 370 (1958); and *Amherst Coal Co.*, 11 T.C. 209 (1948). Each of these cases, however, relates to depletion problems, and not to the question of whether gain or loss is to be recognized in the respective years in which separate leases were abandoned, canceled, or terminated. *Witherspoon Oil Co.*, 34 B.T.A. 1130 (1936), involved the disallowance of a deduction for undepleted cost of individual oil wells upon tracts containing other producing wells, and thus distinguishes itself from the instant case. We think it would serve no useful purpose to extend our discussion to a separate consideration of other cases cited on brief since we think it is clear that they are distinguishable on their respective facts, and are, in essence, disposed of by the principles already discussed herein.

Upon the basis of the foregoing discussion, we hold that petitioners are entitled to a loss deduction in 1953 only with respect to Federal lease D–053968 which was canceled in that year.

Our holding to the above effect, however, does not wholly dispose of the issue because petitioners have produced no evidence of basis (in this instance, cost) to be allocated to the lease canceled in 1953. There is some vague, generalized testimony from which it might be inferred

that this lease may have been proportionately somewhat more valuable than the respective 4 leases terminated in years prior to 1953. There is no evidence, however, showing how much greater such value may have been, or whether the difference was substantial or not. Actually, each of the 5 leases turned out to be a complete loss.

Despite the lack of evidence as to basis, or the actual amount of the loss incurred in respect of the lease canceled in 1953, it is clear that *some* loss occurred in that year. We think the evidence warrants our application of the principles of *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930). The only practical approach under the circumstances of this case is to allocate cost as between the 5 leases on a per acre basis, resulting in an allocation of $652.77 as the basis of the lease canceled in 1953, and determination of a loss in that amount for that year. No depletion deductions were allowable or taken as to any of the 5 leases. Respondent concedes a basis of approximately $650.

Petitioner objects to a per acre allocation, and relies on *Driscoll* v. *Commissioner*, 147 F. 2d 493 (C.A. 5, 1945), reversing, in part, a Memorandum Opinion of this Court dated January 27, 1944. There are two answers to this objection. The first is that *Driscoll, supra,* involved depletion and not gain or loss on abandonment, cancellation, or termination. The second is that if we do not allocate on a per acre basis, we would be forced to conclude that the basis for the lease canceled in 1953 must be taken as zero, petitioners having failed to meet the burden of proving a basis (other than that inferred by us on a per acre calculation in implementing the *Cohan* approach) for the lease in question.

## II.

Turning to the documentary stamp tax issue, which is present in both of the taxable years involved herein, the facts, as wholly stipulated, show that in their income tax returns for said years, petitioners deducted as a claimed business expense, Federal documentary stamp taxes which they paid on the sale of dividend-paying stock and rental real estate. Petitioners urge that the expenditures in dispute are allowable as ordinary and necessary nonbusiness expenses incurred in the "production or collection of income" within the purview of section 23 (a) (2) of the Code of 1939 and section 212 of the Code of 1954, and, hence, are deductible from gross income under sections 23 (c) (1) (F) and 164 (b) (3) of the 1939 and 1954 Codes, respectively.[2]

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

\*      \*      \*      \*      \*      \*      \*

(2) NON-TRADE OR NON-BUSINESS EXPENSES.—In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the pro-

In essence, it is petitioners' position that since profit was realized from the sale of the securities and rental property here in question, the documentary stamp taxes paid on the disposition thereof were an ordinary and necessary expense incurred for the production of this income.

Respondent disallowed the deductions in question, either as business or nonbusiness expenses, treating them instead as capital expenditures in determining gain on the sale of capital assets.

We think it is clearly established that when securities or other capital assets are sold or disposed of by one not a dealer, expenditures incident to the sale are not to be treated as ordinary and necessary expenses, but are to be considered in the nature of capital expenditures to be offset against the selling price or the amount realized from the sale. *Spreckels* v. *Commissioner*, 315 U.S. 626 (1942). It is to be noted that *Spreckels*, *supra*, had to do with the deduction of commissions on sale of securities. As will appear from our discussion, *infra*, the statutory provisions relating to the deduction of stamp taxes differed in the years involved in *Spreckels*, *supra*, from the provisions applicable to the years here involved. The statutory provisions applicable to the instant case clearly bring expenditures for stamp taxes on sale of securities and real estate within the principles announced in *Spreckels*, *supra*, when applied to vendors not in the business of buying and selling the assets in question.

In the instant case the facts are undisputed. Petitioners were not dealers in securities or real estate during either of the taxable years 1953 or 1954. The stamp taxes were paid by petitioners in connection with the sale of capital assets and were directly attributable to such sale. As such, they were not ordinary and necessary expenses for the production or collection of income within the meaning of section 23(a)(2), but were clearly capital expenditures under the principles announced in *Spreckels*, *supra*. As such, they are not deductible in full in determining gross income, but are to be treated as an offset against the selling price in the same manner as broker's fees or selling commissions. See also *Helvering* v. *Winmill*, 305 U.S. 79 (1938). The determination of gain from the sale of the assets in question, of course, involves a computation under section 111 of the 1939 Code and section 1001 of the 1954 Code. These sections provide that the gain from

---

duction or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

\*     \*     \*     \*     \*     \*     \*

(c) TAXES GENERALLY.—

(1). ALLOWANCE IN GENERAL.—Taxes paid or accrued within the taxable year, except—

\*     \*     \*     \*     \*     \*     \*

(F) Federal import duties, and Federal excise and stamp taxes (not described in subparagraph (A), (B), (D), or (E)), but this subsection shall not prevent such duties and taxes from being deducted under subsection (a).

Note: The corresponding provisions of the Code of 1954 (sec. 164(b)(3)) are substantially the same.

the sale of property shall be the excess of the amount realized over the adjusted basis, and the amount realized is the sum of any money received, plus the fair market value of whatever else is received. All expenses of sale, including the cost of documentary stamp taxes, enter into that computation. See *Samuel C. Chapin*, 12 T.C. 235, 238 (1949), affirmed on another issue 180 F. 2d 140 (C.A. 8, 1950). See Rev. Rul. 55–756, 1955–2 C.B. 536.

Petitioners, relying on Regulations 118, section 39.23(a)–15(2)(b),[3] and *Agnes Pyne Coke*, 17 T.C. 403 (1951), affd. 201 F. 2d 742 (C.A. 5, 1953), argue that the term "income," for the purposes of sections 23(a)(2) and 212, "is not confined to recurring income but applies as well to gains from the disposition of property," and hence the stamp taxes are deductible from gross income as ordinary and necessary expenses. We have carefully considered the aforesaid authorities and do not find them applicable to the instant factual situation or inconsistent with respondent's view. We have set forth the provisions of section 39.23(a)–15(1) and (2)(b) in footnote 3. We think a mere reading thereof shows their applicability to the facts of the instant case, and that further discussion of the regulations is unnecessary. In *Agnes Pyne Coke, supra*, the taxpayer instituted suit against her divorced husband, seeking the recovery of title to stock and options to which she claimed a one-half legal interest, and for all sums of money due her. After a compromise agreement whereby the taxpayer recovered her share of the stock and income, she sought to deduct the cost of legal fees under section 23(a)(2). We held that to the extent legal expenses were incurred by her to recover her basis and cost in the property (stock and options), such expenses were capital in nature, not deductible from gross income. We allowed the deduction of the remainder of the legal expenses incurred because they were

---

[3] Regs. 118.

Sec. 39.23(a)–15 *Nontrade or nonbusiness expenses.* (a) Subject to the qualifications and limitations in chapter 1 and particularly in section 24, an expense may be deducted under section 23(a)(2) only upon the condition that:

(1) It has been paid or incurred by the taxpayer during the taxable year (i) for the production or collection of income which, if and when realized, will be required to be included in income for Federal income tax purposes, or (ii) for the management, conservation, or maintenance of property held for the production of such income; and

(2) It is an ordinary and necessary expense for either or both of the purposes stated in subparagraph (1) of this paragraph.

(b) The term "income" for the purpose of section 23(a)(2) comprehends not merely income of the taxable year but also income which the taxpayer has realized in a prior taxable year or may realize in subsequent taxable years; and is not confined to recurring income but applies as well to gains from the disposition of property. For example, if defaulted bonds, the interest from which if received would be includible in income, are purchased with the expectation of realizing capital gain on their resale, even though no current yield thereon is anticipated, ordinary and necessary expenses thereafter incurred in connection therewith are deductible. Similarly, ordinary and necessary expenses incurred in the management, conservation, or maintenance of a building devoted to rental purposes are deductible notwithstanding that there is actually no income therefrom in the taxable year, and regardless of the manner in which or the purpose for which the property in question was acquired. * * *

incurred in recovering "an amount of income which, if and when recovered, must be included in income." In the instant case, it is clear that the stamp taxes in question were not ordinary and necessary expenses, and were not paid by petitioners to recover income. There is nothing in *Agnes Pyne Coke, supra*, which supports the view that expenditures for the sale of securities or real property are to be treated as other than capital expenditures under section 23(a)(2).

In further support of their position, petitioners cited *United States Playing Card Co.*, 15 B.T.A. 975 (1929); *Baltimore & Ohio Railroad Co.*, 30 B.T.A. 194 (1934); and *Alice G. K. Kleberg*, 2 T.C. 1024, 1029, 1034 (1943), wherein we held that stamp taxes paid in connection with the purchase or sale of securities were deductible in full from gross income in the year paid. Significantly, these cases arose prior to the enactment of section 23(a)(2), added to the law by section 121 of the Revenue Act of 1942, and made applicable to taxable years beginning after December 31, 1943. We are mindful that until the Revenue Act of 1942, Federal stamp transfer taxes, along with many other Federal excise taxes, were deductible as a current expense from gross income. By that Act, subparagraph (F) was added to section 23(c)(1) of the 1939 Code so that the section thereafter provided that Federal excise and stamp taxes were not deductible unless they came within the provisions of section 23(a)(1) or (2), which provisions are not here applicable for the reasons stated *supra*. As mentioned in footnote 2, the corresponding provisions of the 1954 Code (section 164(b) (3)) are substantially the same. See I.T. 3806, 1946-2 C.B. 41, where the Commissioner treats the cost of stamp taxes incurred by a nondealer in securities or rental property as an offset against the selling price of the property.

Petitioners have also called our attention to *Hirshon* v. *United States*, 126 Ct. Cl. 587, 116 F. Supp. 135 (1953), superseding 113 F. Supp. 444, where the Court of Claims held that the taxpayer was entitled to deduct Federal excise stamp taxes as "ordinary and necessary business expenses" under section 23(a), which permits the deduction, *inter alia*, of ordinary and necessary expenses incurred in carrying on a trade or business. There was no reference in the court's opinion to section 23(a)(2). We have no occasion to discuss the question of whether or not the Court of Claims was correct in accepting the view that the taxpayer was in the *business* of buying and selling securities. The fact is that the Court of Claims so held. Once this holding is accepted, there is nothing in the application of the law by the Court of Claims which is inconsistent with the conclusions which we have reached in the instant case, in which it is stipulated that petitioners were not dealers in securities or real estate, and there is no evidence that they were in the business of buying and selling securities or real estate. If they had been, the treatment of their

gains and losses, as well as the expenses of purchase and sale, would receive different treatment.

Since, upon the facts as accepted by the Court of Claims, the issue differs fundamentally from that presented in the instant case, there is no occasion for us to apply the rationale of *Hirshon, supra,* to the facts before us with respect to which the appropriate application of the law is well established and requires a different conclusion. See Rev. Rul. 55–756, *supra.*

Upon the basis of the foregoing discussion, we sustain respondent's treatment of the stamp taxes paid in connection with the sale of securities and real estate.

*Decision will be entered under Rule 50.*